IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79854-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHRISTOPHER BURTON, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Christopher Burton challenges his convictions for second degree assault and fourth degree assault, arguing they are based on the same course of conduct and, thus, violate double jeopardy. We agree and remand to the superior court to vacate the fourth degree assault conviction.

## FACTS

Virginia Lord met Burton while working in prison outreach. Virginia[1] characterized herself as an active drug addict for 30 years. When she began dating Burton, she had been sober for approximately 1 year, after spending the previous 20 years in and out of recovery. Burton also had a history of substance abuse.

---

[1] Virginia and Burton married in October 2016, after the incidents in question. As a result of the marriage, Virginia chose to change her last name to Burton. We use Virginia's first name to differentiate her from Appellant. No disrespect is intended.

Citations and pin cites are based on the Westlaw online version of the cited material.

In the first two years of their relationship, Burton did not use drugs or alcohol.  But in March 2016, Burton relapsed, and Virginia broke up with him about a month later, kicking him out of the apartment they had shared.  In fact, using drugs, alcohol, or tobacco on the property was a violation of the lease agreement, so the landlady forbade Burton's presence on the property.

On June 28, 2016, Virginia obtained a temporary protection order against Burton because he had been violent toward her.  The court set a hearing for entry of the final order for July 12, 2016.  Virginia sent Burton a photograph of the protection order via text message, telling him, "I am done with you."  She gave a copy of the order to her landlady to deliver to Burton if she saw him.

Virginia saw Burton at an annual Narcotics Anonymous picnic on July 4, 2016. They argued.  She wanted to serve him with the protection order, but Burton left before she could do so.  She too drove away, but Burton pulled up behind her and confronted her when she stopped at a stop sign.  He was angry and yelling at her for wanting to serve him with the protection order.  When Burton drove off a second time, Virginia drove to her sponsor's house to watch fireworks.  On her way home from her sponsor's house, she called Burton, and they argued again.  She got home around midnight and went to bed.

Sometime around 2:00 a.m. on July 5, 2016, Virginia woke up to Burton banging on her door.  What occurred thereafter was disputed at trial, primarily because Virginia's recounting of events changed over time.  In Virginia's 2:45 a.m. call to 9-1-1, she told the operator that Burton "punched me in my ribs.  He punched me in my back.  He grabbed me by my hair."  The first officer on the scene, Nathan

Worthen, said he arrived around 2:50 a.m. and found Virginia lying on the floor between the kitchenette and the bed, in the fetal position, with blood on her face and hands and on the area around her as well. Officer Worthen testified that Virginia told him Burton punched her in the back and ribs multiple times. He also stated that Virginia told him that Burton forced his way into the apartment, pushed her toward the bed, began taking off her clothes, and forced her onto the bed before sexually assaulting her.

Officer Nicholas Plemel also arrived on scene, and his testimony of events mirrored Officer Worthen's. In addition, Officer Plemel took Virginia's statement at the hospital. According to Officer Plemel, Virginia said that Burton forced his way into the apartment, he punched her several times on her back as well as in the head, and sexually assaulted her. Virginia told Officer Plemel that when Burton rolled over and she thought he was going to go to sleep, she called 9-1-1, and, at that time, he "physically assaulted her again," by punching her with a closed fist and then strangling her to the point where she could not breathe and her vision narrowed.

In a later interview with Detective Juan Tovar, Virginia told him that Burton punched her on her back around the ribcage and around her head while they were having sex. Detective Tovar testified Virginia told him Burton assaulted her both before and during the 9-1-1 call.

Nancy Brajtbord, a sexual assault nurse examiner, examined Virginia at the hospital. She testified that Virginia told her that Burton came "crashing through the door, immediately picked her up and threw her down onto a bed." According to

Brajtbord, Virginia reported that Burton hit her multiple times on the left side of her head, neck, and jaw with his fist, and after they had sex, Burton "picked her up and threw her against some glass shelves." Virginia also told Brajtbord that she was strangled, and Brajtbord observed the marks on her neck consistent with strangulation.

Dr. Hillary Thomasser also examined Virginia on July 5, 2016. According to Dr. Thomasser, Virginia reported that after she and Burton had sex, he hit her "in the face, head, neck, back, and arms with his fists, knees, elbows, and feet. He choked her twice, but released her both times without her losing consciousness."

Virginia's injuries included bruising under her left eye; swollen, bruised, and lacerated lips; redness on her neck where she had been choked; bruises behind her ear, on her arms, and around her wrists; some evidence of being hit with something like a fist; lacerations and bite marks on her back; and abrasions on her upper thighs.

By trial, Virginia's testimony regarding the incident changed. According to Virginia, she opened the door to let Burton inside and could smell alcohol on his breath. Virginia testified that when Burton came into the house, "we immediately moved towards the bed and started to have sex." Virginia stated that after they had sex, she got up, walked away from the bed, and told Burton to leave because he was drunk. She testified he then tackled her back onto the bed, trying to get her to lay down with him again, but she did not consider this incident to be an assault. In fact, she denied being assaulted before she called 9-1-1, testifying that the only thing he had done up to that point was "be drunk and annoying."

- 4 -

But she "really wanted him to leave." Because she only wanted him to leave and not go to jail, she tried calling and texting other people to get him out of her apartment. When Virginia could not reach anyone, she called 9-1-1 at 2:45 a.m. According to Virginia, at that time, Burton was sitting on the bed with his head in his hands, crying and telling her he loved her. Although she did not want things to escalate, she was "really kind of ambivalent about calling [9-1-1] in the first place." While Virginia was on the phone with the 9-1-1 operator, Burton attacked her. Virginia had her back to Burton when he jumped on her and "started beating the crap" out of her. At some point she dropped to the ground, and Burton put his hands around her throat and choked her until she was almost unconscious. Virginia was shocked and angry that she had been "beaten into an oblivion by the person that [she] loved and trusted more than anything in the . . . world."

Virginia denied that Burton forced his way into the apartment, but admitted that she had told police he did. She further testified that although she told the detective that Burton beat her while they were having sex, she did not actually remember if he had in fact done so.

Virginia also denied that Burton forced her to have sex despite the fact that she had reported to police that he had raped her. She testified:

[H]e beat me almost -- what I thought was going to be to death. I wanted to hang him.

So when the cop asked me -- when I described the incident, he asked me if I wanted to charge it as a sexual assault. I was so mad because of what he [Chris] had done -- I couldn't even get off the floor.

. . . .

- 5 -

There was blood everywhere.  I was in a lot of pain.

    . . . .

[T]he officer asked me what had occurred, and I was describing the situation.  And I said, [h]e pushed me down onto the bed.  And I think with some of the language that I was using, [the officer] asked me if I wanted to charge it as a sexual assault.  And the light bulb went on.  And I wanted Chris to hang for what he had just done to me, and so yes, that I wanted to move forward with that.

According to Virginia, she later decided that she had to speak up and let everyone know that she consented to having sex with Burton that night because she could not let him go to prison for something he did not do.

The State charged Burton with second degree rape (count 1), second degree assault by strangulation (count 2), and first degree burglary (count 3).[2]  At the jury trial, the State presented testimony from Virginia as well as responding officers, the investigating detective, and medical professionals who interacted with Virginia shortly after the incident.

In closing, the State summarized the events in question by arguing Burton "forced his way into Virginia's apartment.  He beat her, raped her, and when she called for help, he renewed his attack and beat her again."  Burton argued that when he showed up at 2:00 a.m., Virginia let him in, they had sex, and when she called 9-1-1 as a last resort to get him to leave because he was drunk and annoying, he admitted "he lost it."  He asked the jury to convict him of assault but to acquit him of raping Virginia.

---

[2] The State also charged Burton with misdemeanor violation of a domestic violence protection order.  Burton does not challenge this conviction.

The trial court provided jury instructions that included fourth degree assault as a lesser included offense to the first degree burglary charge (count 3). Count 3's "to convict" instruction provided:

> To convict Christopher Burton of the crime of burglary in the first degree as charged in count 3, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about July 5, 2016, Christopher Burton unlawfully entered or remained unlawfully in a building;
>
> (2) That the entering or remaining was with intent to commit a crime against a person or property therein;
>
> (3) That in so entering or while in the building or in immediate flight from the building Christopher Burton assaulted a Virginia Burton; and
>
> (4) That any of these acts occurred in the State of Washington.

The lesser included "to convict" instruction provided:

> To convict Christopher Burton of the crime of assault in the fourth degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about July 5, 2016, Christopher Burton assaulted Virginia Burton; and
>
> (2) That this act occurred in the State of Washington.[3]

The jury found Burton guilty of second degree assault by strangulation under count 2 and fourth degree assault, the lesser included offense, under count 3.[4] The trial court sentenced Burton to 29 months on the second degree assault

---

[3] This same lesser included instruction was provided for count 2.

[4] The trial court granted the State's eventual motion to dismiss the second degree rape charge when it was unable to obtain a guilty verdict after trying Burton twice on that charge.

conviction. It suspended his 364-day sentence for the fourth degree assault conviction.[5]

Burton appeals.

ANALYSIS

Burton argues the double jeopardy clause bars his two assault convictions because his acts constituted only a single course of conduct. We agree.

Both the state and federal constitutions prohibit a court from enforcing multiple punishments against the same individual for the same offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; State v. Calle, 125 Wn.2d 769, 772, 888 P.2d 155 (1995). We review alleged double jeopardy violations de novo. State v. Villanueva-Gonzalez, 180 Wn.2d 975, 979-80, 329 P.3d 78 (2014).

To determine if a defendant has been punished multiple times for the same offense, Washington courts traditionally apply the "same evidence" test, under which a defendant's double jeopardy rights are violated if the defendant is convicted of offenses which are the same in law and fact. Calle, 125 Wn.2d at 777-78. But the "same evidence" test is inapplicable to a situation where a defendant has multiple convictions for violating the same statute. State v. Adel, 136 Wn.2d 629, 633, 965 P.2d 1072 (1998). Instead, the proper inquiry in such a case is what "unit of prosecution" the legislature intended as the punishable act under the specific criminal statute. Id. at 634. "When the [l]egislature defines the scope of a criminal act (the unit of prosecution), double jeopardy protects a

---

[5] It also suspended his 364-day sentence for misdemeanor violation of a domestic violence protection order. It ordered all sentences to be served consecutively with Burton's convictions in a Cowlitz County matter.

defendant from being convicted twice under the same statute for committing just one unit of the crime." Id.

Nevertheless, the "unit of prosecution" test still applies even though Burton was convicted under two different assault statutes. In Villanueva-Gonzalez, the Supreme Court held that the "unit of prosecution" analysis should apply when a defendant is convicted of two counts of assault, even if those assaults were of different degrees. 180 Wn.2d at 981-82. After evaluating the legislation at issue, the Supreme Court concluded that the legislature intended assault to be treated as a course of conduct offense, rather than a separate act offense. Id. at 982, 984.

Determining whether two assaults constitute one course of conduct is highly fact-dependent. Id. at 985. The court provided several factors to consider:

—The length of time over which the assaultive acts took place,
—Whether the assaultive acts took place in the same location,
—The defendant's intent or motivation for the different assaultive acts,
—Whether the acts were uninterrupted or whether there were any intervening acts or events, and
—Whether there was an opportunity for the defendant to reconsider his or her actions.

Id. The court further cautioned that "no one factor is dispositive, and the ultimate determination should depend on the totality of the circumstances, not a mechanical balancing of the various factors." Id.

Burton relies on Villanueva-Gonzalez, in which the defendant head-butted his girlfriend, breaking her nose, and then grabbed her by the neck. Id. at 978. A jury convicted the defendant of two separate counts of assault. Id. at 979. The court held there was only one unit of prosecution because the assaults took place in the same location over a short time period, there were no intervening events,

and there was no opportunity for the defendant to reconsider his actions. Id. at 986. We find little to distinguish this case from Villanueva-Gonzalez.

The State contends the jury heard testimony regarding three assaultive acts—an assault when Burton forced his way into the apartment, the assault during the rape, and the assault by strangulation when Virginia called 9-1-1. There are two problems with this argument. First, the State dismissed the rape charge after trying Burton twice without obtaining a conviction. We are disinclined to include in our analysis criminal conduct the State could not prove occurred.

But second, even if we accept that Burton assaulted Virginia as he forced his way into her apartment, raped her, and then assaulted her again by way of strangulation while she was on the telephone, this argument ignores the Supreme Court's holding in Villanueva-Gonzalez that multiple assaultive acts can constitute a single course of conduct.

The State argues the Villanueva-Gonzalez factors weigh in favor of finding multiple courses of conduct here because (1) Burton had different motivations for the different assaults—the first one was committed to gain entry into the apartment and the second one was to prevent Virginia from calling 9-1-1; and (2) there was an intervening event between the two assaults—Burton fell asleep or passed out from intoxication. We disagree because the record does not support these arguments.

All of the factors here weigh in favor of determining that Burton's two assaultive acts were part of one course of conduct. First, the crimes occurred during a short period of time—under 45 minutes—and took place inside Virginia's

apartment. Second, there is no evidence that Burton's intent or motivation for the various assaultive acts differed. The evidence at trial indicated Virginia had obtained a protection order and told Burton about it. Burton was angry because Virginia had obtained a protection order prohibiting contact with her when he wanted to reconcile. He showed up at her apartment at 2:00 a.m., they had sex and then argued when Virginia asked him to leave. When he refused to leave, she called 9-1-1, at which point he admitted he beat her quite severely. There is no indication Burton's motive when he first entered the apartment was any different than when he assaulted her while she was on the phone with 9-1-1—he was still angry and wanted to reconcile. Nor does the record support the State's contention that Burton fell asleep after the couple had sex and that some time passed before she got out of bed and called 9-1-1.

The case is in many ways analogous to In re Personal Restraint Petition of White, 1 Wn. App. 2d 788, 407 P.3d 1173 (2017). In that case, this court held that the defendant's actions of pointing a gun at his girlfriend, threatening to kill her, throwing her to the floor, beating her, and then strangling her—multiple acts of assaultive conduct—constituted a single course of conduct. Id. at 796. The State argued in White that the victim's act of standing up and walking away and White's uncharged assault (throwing her to the floor and beating her) intervened to break the causal connection between the two assaults of which White was convicted.[6] Id. at 795. This court rejected that contention because the trial record showed

---

[6] The State had charged White with one count of second degree assault with a deadly weapon for pointing the gun at his girlfriend and one count of second degree assault by strangulation. Id. at 791. The jury convicted him as charged. Id. at 789.

"one continuous struggle from the time White pointed a gun at Stevens to throwing her on the floor and beating her to the time he began to strangle her." Id. at 796.

Similarly here, under the State's theory of this case, there was one continuous struggle between Burton and Virginia from the time the State contended he forced his way into the apartment until he fled the scene after beating Virginia to "an oblivion." Even if Virginia's trial testimony was deemed credible, despite her pretrial statements to police and medical care providers, she essentially described a continuous series of events over the course of 45 minutes that do not demonstrate any intervening events.

Based on the evidence in the record before us, we conclude Burton's fourth degree assault conviction violated the double jeopardy clause because it was based on the same course of conduct as the second degree assault by strangulation conviction. We reverse Burton's conviction for fourth degree assault and remand to the trial court to vacate this conviction.

_Andrus, A.C.J._

WE CONCUR: